STEVEN T. GUBNER – Nevada Bar No. 4624
ROBYN B. SOKOL (admitted pro hac vice, CA Bar No. 159506)
COREY R. WEBER (admitted pro hac vice, CA Bar No. 205912)
JORGE A. GAITAN - Bar No. 288427
BRUTZKUS GUBNER
300 S. 4th Street, Suite 1550
Las Vegas, NV 89101
Telephone:  (818) 827-9000
Facsimile:   (818) 827-9099
Email:        sgubner@bg.law
                   rsokol@bg.law
                   cweber@bg.law
                   jgaitan@bg.law

Special Litigation Counsel for,
Brian D. Shapiro, Chapter 7 Trustee

## UNITED STATES BANKRUPTCY COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| In re | Case No. 18-10792-MKN |
| Lucky Dragon Hotel & Casino, LLC, | Chapter 7 |
| Debtor. | |
| Brian D. Shapiro, solely in his capacity as Chapter 7 Trustee for Lucky Dragon Hotel & Casino, LLC, | **COMPLAINT FOR:**<br><br>**(1) BREACH OF FIDUCIARY DUTY; AND**<br>**(2) GROSS NEGLIGENCE** |
| Plaintiff, | |
| v. | |
| Las Vegas Economic Impact Regional Center, LLC, a Nevada limited liability company; David Jacoby, an individual; William P. Weidner, an individual; Eastern Investments, LLC, a Nevada limited liability company; Bofu, LLC, a Nevada limited liability company; Andrew S.  Fonfa, an individual; Weidner Management, LLC, a Nevada limited liability company; James Weidner, an individual, | |
| Defendants. | |

By this complaint ("**Complaint**"), as may be amended, Plaintiff, Brian D. Shapiro solely in his capacity as the Chapter 7 Trustee of the Lucky Dragon Hotel & Casino, LLC bankruptcy estate ("**Trustee**" and "**Plaintiff**"), seeks among other things, a judgment finding that Las Vegas Economic Impact Regional Center, LLC; David Jacoby; William P. Weidner; Eastern Investments, LLC; Bofu, LLC; Andrew S.  Fonfa; Weidner Management, LLC; and James Weidner (collectively referred to as "**Defendant(s)**") each breached their fiduciary duty of care, fiduciary duty of loyalty and fiduciary duty of good faith to Lucky Dragon Hotel & Casino, LLC ("**Debtor**") by engaging in self-dealing, by entering into transactions that were not in the best interests of the Debtor, and failing to exercise reasonable prudence in making business judgments for the Debtor.  The actions of the Defendants were also grossly negligent and resulted in harm to the Debtor.

In support of this Complaint, the Trustee complains and alleges as against Defendants as follows:

## JURISDICTION AND VENUE

1.      The Debtor commenced its Chapter 11 case by filing a voluntary petition for relief under Chapter 11 of the United States Bankruptcy Code, 11 U.S.C. §§ 101, et seq. ("**Bankruptcy Code**") on February 16, 2018 ("**Petition Date**"), in the United States Bankruptcy Court for the District of Nevada, Case No. 18-10792 (the "**LLC Case**").

2.      Lucky Dragon, LP ("**LP**") commenced its Chapter 11 case by filing a voluntary petition for relief under Chapter 11 of the Bankruptcy Code on February 21, 2018, in this Court, Case No. 18010850 (the "**LP Case**").  The LP Case and LLC Case were jointly administered under Case No. 18-10792-LEB.

3.      By Court order entered on November 27, 2018, the LP Case and LLC Case were each converted to chapter 7 cases and chapter 7 trustees were appointed.

4.      The Chapter 7 trustee for the Debtor is Brian D. Shapiro.

5.      This proceeding is brought pursuant to Fed. R. Bankr. P. 7001.

6.      This Court has jurisdiction over this Complaint pursuant to 28 U.S.C. §§ 157, 1334 and 2201.

7.      Venue is proper in this Court, including venue pursuant to 28 U.S.C. §§1408 and

1409, because, among other things, this is the district in which the LLC Case is pending. Pursuant to 28 U.S.C. § 1391, venue is also appropriate as Defendants are authorized to and regularly carry out substantial business in this district and the acts and conduct complained of herein took place within this district. Accordingly, this Court also has personal jurisdiction over the Defendants.

8.    Plaintiff consents to the entry of final orders or judgment by the bankruptcy court if it is determined that the bankruptcy court, absent consent of the parties, cannot enter final orders or judgment consistent with Article III of the United States Constitution.

**PARTIES**

9.    At all times relevant to this case, the Debtor was and is a Nevada limited liability company. The Debtor voluntarily filed a Chapter 11 bankruptcy petition on the Petition Date.

10.    On November 27, 2018, the United States Bankruptcy Court for the District of Nevada ("**Court**") entered an order converting the Debtor's bankruptcy case from a Chapter 11 case to a Chapter 7 case [Docket No. 46]. Thereafter, Brian D. Shapiro was appointed the chapter 7 trustee for the Debtor's case and is the duly acting Chapter 7 trustee for the estate of the Debtor.

11.    Defendant Las Vegas Economic Impact Regional Center, LLC ("**LVEIRC**") is a limited liability company organized and duly existing under the laws of the State of Nevada. LVEIRC is the sole member and managing member of the Debtor. LVEIRC was formed on or about August 30, 2011 by its members, Eastern Investments, LLC and Bofu, LLC, by and through Andrew S. Fonfa, James Weidner and William P. Weidner. LVEIRC's Operating Agreement provides that its principal purpose is acting as an EB-5 Regional Center and that it will give preferential treatment to EB-5 Regional Center projects brought by entities that are owned or controlled, directly or indirectly by William P. Weidner.

12.    Eastern Investments, LLC is a limited liability company organized and duly existing under the laws of the State of Nevada ("**Eastern**) and a managing member of LVEIRC.

13.    Bofu, LLC is a limited liability company organized and duly existing under the laws of the State of Nevada ("**Bofu**") and a managing member of LVEIRC.

14.    Andrew S. Fonfa ("**Fonfa**") is an individual residing in Clark County in the State of Nevada. Upon information and belief, Fonfa was and is a member and manager of Eastern and

2254904

Sahara Investments, LLC ("**Sahara**") at all relevant times alleged herein.  Plaintiff is further informed and believes that Fonfa controlled and directed the Debtor and served as its officer and/or manager.  The Trustee is informed and believes that Fonfa was at all times relevant herein the Chief Executive Officer of the Debtor and LVEIRC.

15.     William P. Weidner ("**W. Weidner**") is an individual residing in Clark County in the State of Nevada. Upon information and belief, Weidner, at all relevant times, controlled Bofu and Weidner Management, LLC ("**WM LLC**").  Plaintiff further believes that W. Weidner directed and controlled the Debtor and served as its officer and/or manager.   W. Weidner served as President of LVEIRC and the Debtor.

16.     David Jacoby ("**Jacoby**") is an individual residing in Galveston, Texas.  Jacoby at all relevant times herein was the Chief Operating Officer and Vice President of LVEIRC, the sole member manager of the Debtor.  The Trustee is informed and believes that at all relevant times herein Jacoby also served as the Chief Operating Officer and Vice President of the Debtor.

17.     WM LLC is a limited liability company organized and duly existing under the laws of the State of Nevada and the managing member of Bofu.

18.     James Weidner is an individual residing in Clark County in the State of Nevada and is the member and manager of WM LLC.

## **GENERAL ALLEGATIONS**

### **Introduction**

19.     LVEIRC is the sole member manager of the Debtor and the general partner of LP, both of which were formed for the purpose of developing and operating a hotel and casino on the Las Vegas Strip and Sahara Avenue referred to as the Lucky Dragon Hotel & Casino (the "**Resort**").

20.     The Resort was the first casino resort in Las Vegas designed from the ground up to create an authentic Asian cultural and gaming experience.  When the Resort opened in November 2016, the casino property originally started with: (i) a 27,500 square foot, two-level casino; (ii) 37 gaming tables and 287 slot machines; (iii) 203 hotel rooms, including 14 suites and a penthouse; (iv) 4 Asian inspired restaurants; (v) 3 bars and lounges; and (vi) a first class spa.

2254904

21. Through a web of limited liability companies, W. Weidner, Fonfa, Jacoby and James Weidner pursued the development of the Resort with grossly inadequate capital, unrealistic projections, a complete disregard for corporate formalities and a disregard for the best interests of the Debtor. As officers and managers of the Debtor, the Defendants breached each of their fiduciary duties of good faith, loyalty, and care in carrying out their functions on behalf of the Debtor. Moreover, the Defendants failed to exercise reasonable prudence in making business judgments for the Debtor.

22. Defendants, the officers and managers of the Debtor, wore multiple "hats," including: (a) serving as officers and/or managers of the Debtor while concurrently serving as officers and/or managers of LP; (b) serving as officers and/or managers of the Debtor while concurrently leasing facilities to the Debtor; (c) serving as officers and/or managers of the Debtor while concurrently negotiating the sale of their ownership interests in the Debtor, LP, and LVEIRC in a manner that was not in the best interests of the Debtor. Defendants repeatedly ignored the conflicts of interest and acted in their own self-interests rather than the interests of the Debtor.

23. Defendants also failed to meet their most basic obligations to the Debtor by failing to exercise reasonable prudence in making business judgments for the Debtor. The Debtor was woefully undercapitalized. LVEIRC, as the sole member of the Debtor and the general partner of the LP, failed to make the required capital contributions to the Debtor. LVEIRC received a management fee in the amount of approximately $8,500,000 from EB-5 investors, but rather than use these funds to support the development of the Resort and operations of the Debtor, LVERIC disbursed a good portion of the $8,500,000 to its members, Eastern and Bofu. LVEIRC also had the Debtor pay LVEIRC's expenses at times when the Debtor was unable to pay debts as they became due or was insolvent and had the Debtor fund transactions that were not for the benefit of the Debtor.

**Formation and Corporate Structure**

24. On or about August 30, 2011, LVEIRC was formed to "engage in any lawful business, including, without limitation, acting as an EB-5 Regional Center… [that] will give preferential treatment to EB-5 Regional Center projects brought by entities that are owned or controlled, directly or indirectly, by William P. Weidner." The Trustee is informed and believes that

2254904

LVEIRC was formed by and at the direction of Fonfa and W. Weidner.

25.     The members of LVEIRC at the time of formation and at all relevant times herein are Eastern and Bofu, which also serve as managers.  The managing member of Eastern is Fonfa.  The managing member of Bofu is WM LLC.  LVEIRC, the Debtor, LP and the Resort were managed and controlled by Fonfa, W. Weidner, James Weidner and Jacoby.  Defendants LVEIRC, Fonfa, W. Weidner, James Weidner and Jacoby served as officers of the Debtor and owed a fiduciary duty to the Debtor.

26.     LVEIRC is an EB-5 regional center approved for the development of hospitality and retail spaces.

27.     On or about April 14, 2016, the Debtor filed its articles of organization.  LVEIRC is and was the sole managing member of the Debtor.  Per the Debtor's Operating Agreement, LVEIRC made an initial capital contribution of $1,000.  Based on the Debtor's statement of financial affairs, it appears that no other capital contributions were made to the Debtor by LVEIRC.  Additionally, capital contributions allegedly made to LP by LVEIRC were treated as loans.

28.     LP is a Nevada limited partnership.  LVEIRC is the general partner of LP, and the limited partners are individual EB-5 investors who each invested $500,000, or $89,500,000 in LP, through the EB-5 Immigrant Investor Program.

29.     The Resort was owned by two 2 entities – the Debtor and LP.  The Debtor operated the hotel and casino, and LP owned the real estate and improvements.  The Debtor was the exclusive operator of the Resort.  On or about August 15, 2016, the Debtor and LP entered into the Hotel and Casino License Agreement ("**License Agreement**").   The License Agreement provides that in exchange for the right to operate the Resort, the Debtor shall pay LP a monthly license fee.  The Debtor's income was dependent upon the operations of the Resort.  The Debtor was responsible for operating the Resort and covered all operating expenses.  The Debtor retained all revenues over and above operating expenses less a licensing fee that it was to pay LP pursuant to the License Agreement.

30.     Both the Debtor and LP were controlled by LVERIC (the manager of the Debtor and the general partner of LP) and had the same officers and directors.  Fonfa co-founded LVEIRC and

was and is the Chief Executive officer of LVEIRC, the Debtor and LP.  W. Weidner co-founded

LVEIRC and was and is the President of LVEIRC, the Debtor and LP.  Jacoby was and is the Chief

Operating Officer of LVEIRC, the Debtor and LP.  Fonfa, W. Weidner, and Jacoby served integral

roles in the development, fund raising, construction, strategy, positioning, marketing, capital

initiatives and management of the Debtor and the Resort.

31.    Below is the organizational chart for the Debtor and LP:



32.    Between 2004 and 2011, Defendant Fonfa purchased multiple parcels of vacant land

on which he would later develop a luxury condominium project known as Allure Towers.  The

Allure Towers project failed, and as a result, Fonfa held through various entities a 2.51 acre vacant

parcel located in the northern sector of the Las Vegas Strip, a relatively secluded area, commonly

referred to as 300 West Sahara Avenue, Las Vegas, Nevada (the "**Property**").

2254904

33.     The Resort was primarily funded using money invested through the federal EB-5 program from 179 foreign investors in the total amount of $89,500,000. Fonfa and W. Weidner initially intended to raise $115,000,000 from foreign investors using LVEIRC as a regional center. Investors were provided a limited partnership interest in LP in exchange for their investments.

34.     The alleged capital contribution from Defendants Fonfa and W. Weidner to LP was the transfer of the undeveloped Property from Sahara and Lucky Dragon LLC to LP on or about June 16, 2014. The value of the undeveloped Property is the subject of dispute. The Trustee is informed and believes that certain of the Defendants assert that the Property had a value of $22 million at the time it was transferred to LP.   The Trustee believes that the value of the Property was significantly less than $22 million and its fair market value at the time it was transferred to LP may have been less than $4 million.

35.     Defendants Jacoby, W. Weidner and Fonfa at all times relevant treated the Property transfer to LP as a loan and not an investment – capital contribution.

36.     The Updated Comprehensive Business Plan of Lucky Dragon, LP sponsored by LVEIRC and approved by the United States Customs and Immigration Service dated June 2012 ("**Business Plan**") provides that $22,000,000 of the funds raised from EB-5 investors was allocated to land acquisition costs.

37.     Based on the Business Plan, Fonfa, W. Weidner and/or entities owned and controlled by them were to receive $22,000,000 for the property transferred to LP.

38.     LVEIRC, Fonfa and W. Weidner did not properly capitalize the Debtor or the Resort as their capital contribution was included in the breakdown of estimated development costs for the Resort. Based on the Business Plan, Defendants LVEIRC, Fonfa and W. Weidner did not make an initial capital contribution to fund the Resort. The Business Plan specifically provides that the equity contribution from EB-5 investors will be used to "acquire land and construct a luxury Asian-themed casino hotel offering a unique gaming experience along with top-notch retail, restaurant and spa amenities." Of the $115 million that was to be allegedly raised from foreign investment, $22 million was dedicated to "land Acquisition Costs." Defendants attempted to get paid for the Property in an amount dramatically in excess of its fair market value at the time.

39.     The Debtor did not receive any value or capital contribution from the transfer of the Property.

40.     The Resort sits on an assemblage of four parcels, title to which was transferred to LP by a Quitclaim Deed recorded on September 16, 2014 in the official records of the Clark County, Nevada Recorder's Office, as Book and Instrument Number 201409160001691.   Pursuant to the Quitclaim Deed, title to the Property was transferred to LP from 2 entities owned and operated by Fonfa and W. Weidner: (1) Lucky Dragon, LLC a now dissolved Nevada limited liability company; and (2) Sahara, an active Nevada limited liability company.  The Declaration of Value Form attached to and recorded contemporaneously with the Quitclaim Deed states the "Total Value/Sales Price of Property" as $786,000.00.

41.     On information and belief, the combined fair market value of the vacant land comprising the Property, at the time title was transferred to LP, was approximately $3,775,003.67.

42.     The capital contributions that LVEIRC made to the Debtor were *de minimis* and grossly inadequate to sustain its operations.  The Debtor's Schedules state that all capital contributions were made by Eastern, Bofu and LVEIRC to LP.  *See* Schedules, Docket No. 76.

43.     LP's Confidential Private Offering Memorandum ("**POM**") provides that LVEIRC will receive an administrative fee in the amount of at least $50,000 per investor.  LVEIRC received an administrative fee in the amount of approximately $8,950,000, much of which it elected to disburse to its members (ultimately Fonfa and W. Weidner and their related entities) rather than use to operate and sustain the Debtor and the Resort.

44.     The Resort never operated at a profit and the Debtor's operating expenses always exceeded its revenue.  From the opening of the Resort on or about November 2016 through the Debtor's Chapter 11 case, the Debtor was not able to pay its obligations as they came due.

**The Debtor Had Grossly Inadequate Capital and Capital Calls Were Ignored**

45.     While the Debtor made capital calls upon LVEIRC, Fonfa and W. Weidner to fund operations, insufficient capital was contributed by these Defendants to cover the development and business operations of the Debtor and the Resort.

2254904

46.     The purported capital contribution of the Property with an estimated fair market value in the amount of approximately $3.7 million at the time it was transferred to LP was an insufficient capital contribution for the proposed Resort, which initial budgets indicate would cost $115 million, but ultimately cost $165 million.  No amount of the purported contribution of the Property was contributed to the Debtor.

47.     In or about March 2016, LVEIRC, Fonfa and W. Weidner determined that a loan was necessary to complete the Resort.  At this time, construction on the Resort was only one-half complete and all of the EB-5 money had been spent.

48.     Despite obtaining $89,500,000 in EB-5 financing and $8,950,000 in "processing fees," LVEIRC sought additional funding for the Resort from Snow Covered Capital LLC ("**SCC**").

49.     On or around May 3, 2016, SCC loaned LP $30,000,000, as well as an additional $15,000,000 on a revolving basis, pursuant to a construction loan agreement, a secured promissory note, and a line of credit note, each dated on or around May 3, 2016 (collectively, the "**Loans**"). The Loans had an interest rate of 12%.

50.     The Loans were secured by, among other things, a construction deed of trust with assignment of leases and rents, security agreement and fixture filing, dated May 3, 2016 (the "**Deed of Trust**"), covering the Property.  The Deed of Trust was recorded on May 11, 2016 as Document No. 2016-5ll-0002786.

51.     The Loans were guaranteed by Fonfa, W. Weidner and Jacoby.

52.     Even after obtaining the Loans from SCC, there was insufficient funding for the Resort.  In or about the spring of 2017, the Defendants recognizing that their projections for the Resort were seriously flawed and that cost overruns were substantial, began looking for additional funding for the Resort.  Spectrum Gaming Capital was employed to locate additional funding.  On information and belief, this additional funding was also to be used to satisfy the Loans.  These efforts were unsuccessful.

53.     The Defendants waited far too long to raise additional capital and work on refinancing the Loans.  Defendants never contributed adequate capital toward the Resort.

54. In or about June 6, 2017, the Debtor made a cash call of $2,000,000 upon LVEIRC "to cover operation shortfalls and assistance with construction close out." This request was sent to W. Weidner, James Weidner, Fonfa and Jacoby. The Trustee is informed and believes that only a small portion of this capital call, if any, was raised and provided to the Debtor.

55. Commencing in summer of 2017, Fonfa ignored capital calls. The failure of Fonfa to make the requisite capital calls negatively impacted the Resort and the Debtor.

56. On September 1, 2017, SCC recorded a Notice of Default with the Clark County Recorder, starting the foreclosure process with respect to the Property.

57. By December 27, 2017, the Debtor had no operating funds, was looking for financing, was requesting capital contributions from LVEIRC and its principals, and was forced to lay off employees. On January 4, 2018, the Resort issued layoff notices to many of its employees and discontinued casino operations because the Debtor could no longer fund its operations.

58. On January 9, 2018, SCC recorded a Notice of Sale scheduling the sale of the Property and all improvements thereto to take place on February 6, 2018. SCC subsequently postponed the scheduled trustee's sale until February 22, 2018.

59. Thereafter, the Debtor and LP filed for bankruptcy protection.

60. The reluctance by the principals, Fonfa and W. Weidner, through LVEIRC, to make the requisite capital contributions continued through the Debtor's bankruptcy case. For example, rather than make a capital contribution sufficient to keep the Resort up and running for the few months needed (of approximately $100,000/month), the Defendants sought debtor in possession financing which included a 12% interest rate, pre-payment penalty and a loan fee of $120,000 for 9 months of debtor in possession financing. The Court did not approve the debtor in possession financing proposed.

**Defendants Directed the Debtor to Improperly Pay Debts of Defendants, to Avoid Claims Against Them, and Repeatedly Ignored Conflicts and Engaged in Self-Dealing**

61. The Defendants failed to exercise their duties of care and loyalty in making reasonable business decisions for the Debtor pre-petition, or post-petition as the Debtor-in-Possession. Efforts and decisions during the course of the Debtor's bankruptcy case were driven

not by what was best for the Debtor but by what was best for its management – LVEIRC, Fonfa, W. Weidner, James Weidner, Jacoby, and their related entities Bofu, Eastern and WM LLC.

62.     Fonfa and W. Weidner caused the Debtor to enter into lease agreements with entities owned and controlled by them. On or about May 10, 2016, Sahara and the Debtor entered into the Sahara West Executive Park Office Lease by which the Debtor leased office space. The lease includes an early termination fee of $17,980 and monthly rent ranging from $6,399 per month to $10,804 per month.

63.     On or about October 10, 2016, the Debtor executed a promissory note in favor of LP in the amount of $2,230,190. The promissory note was executed by LVEIRC and LVEIRC's members (Bofu and Eastern) on behalf of both the Debtor and LP. This promissory note increased the Debtor's liabilities to the detriment of the Debtor and for the benefit of LP and Defendants.

64.     LVEIRC was the manager of the Debtor. LVEIRC received a management fee of approximately $8.5 million from the EB-5 investors. Instead of LVEIRC contributing capital to the Debtor, or otherwise funding development, construction or operating expenses, Bofu and Eastern received draws from LVEIRC at times when the Debtor was unable to pay debts as they became due or was insolvent and needed money to cover operating expenses.

65.     LVEIRC, Fonfa and W. Weidner also directed the Debtor to make payments to LVEIRC's creditors rather than pay the Debtor's creditors and operating expenses. This was done solely for the benefit of the Defendants. One example of this occurred on or about December 28, 2017, at time when the Debtor was not able to pay its debts as they came due, Jacoby and W. Weidner directed the Debtor to pay invoices for legal services provided by Lewis Roca Rothberber Christie LLP ("**Lewis Roca**"), counsel for LVEIRC, and not counsel for the Debtor. The email from Jacoby states: "Despite our current situation, Bill has asked that you get some additional payments to L&R." Based upon the instruction of Jacoby, the Debtor paid amounts owed by LVEIRC to Lewis Roca.

66.     During Fall 2017, Fonfa and W. Weidner attempted to sell their membership interests in LVEIRC. These negotiations were solely for the benefit of LVEIRC, Bofu, Eastern, Fonfa, W. Weidner, Jacoby, and James Weidner, and were not in the best interests of the Debtor.

67.     On or about September 28, 2017, LVEIRC as the seller executed a Purchase Agreement with Baobei LLC, a Nevada limited liability company on the one hand and LVEIRC, Bofu, Eastern, LP, and the Debtor on the other hand ("**Purchase Agreement**").   This Purchase Agreement provides for the sale of LVEIRC's membership interests to Baobei LLC for *inter alia* the following:

      a.   $2.00 per share for the membership interests of LVEIRC;

      b.   $6,000,000 to W. Weidner and Fonfa upon the closing of a new loan to be obtained by Baobei LLC for the purpose of satisfying the Loans in full, operating expenses, and constructions costs as well as payments to the Defendants;

      c.   The Debtor and LP shall provide a promissory note for the benefit of LVEIRC, Bofu and/or Eastern in the total amount of $12,000,000.  Alternatively, LVEIRC, Bofu and/or Eastern may direct LP and the Debtor to issue 2 notes in the amount of $6,000,000 each for the benefit of W. Weidner and Fonfa;

      d.   Bofu shall be paid an earn out of up to $8,000,000;

      e.   In the event W. Weidner advances any monies for operations or losses to Debtor, he will be reimbursed for such advances from the new loan obtained by Baobei LLC up to $1,500,000.

68.     The Purchase Agreement, executed by Fonfa and Weidner was solely for the benefit of Defendants Fonfa, W. Weidner, Bofu, and Eastern.  The Purchase Agreement was executed while Fonfa and W. Weidner were officers of the Debtor.

69.     The Purchase Agreement is further evidence that W. Weidner and Fonfa never intended the Property to be a capital contribution and sought to be reimbursed for the alleged capital contribution of the Property.

70.     Commencing on or about October 2017 in conjunction with the Purchase Agreement, LP attempted to obtain a loan from Silver Arch Capital Partners LLC for $75,000,000.  Of this loan amount, $6,000,000 was to be paid to Sahara (an entity owned and controlled by Fonfa and Weidner); $45,000,000 was to satisfy the Loans (which would release Fonfa, Jacoby, and W. Weidner from their personal guarantees); and Silver Arch Capital Partners LLC ("**Silver Arch**")

2254904

would receive $1,875,000 as an origination fee.  The loan was for the benefit of Fonfa, Jacoby, W. Weidner and LP.  Nevertheless, the Defendants authorized and instructed the Debtor to pay a due diligence fee of $187,000 to Silver Arch to locate a loan for LP.  The Debtor wired the due diligence fee of $187,500 to Silver Arch on October 5, 2017.  Authorizing this payment by the Debtor to Silver Arch was a violation of the Defendants' duties of care and loyalty to the Debtor.

71.    Silver Arch never secured a loan for LP and the sale to Baobei LLC did not close.

72.    In January 2018, Jacoby attempted to maximize tax benefits to members of LP for the benefit of the EB-5 investors, and without consideration to any impact on the Debtor.  In an e-mail from Jacoby to Bing O'Peek on January 17, 2018, Jacoby stated:

> I also want to get our lawyers in front of the issue of losses being allocated to the LP vs. LLC so that we can hopefully assign as much loss as possible to the EB5 investors to get them the tax benefit.

Later in 2018, Jacoby sent an e-mail making clear that the EB-5 investors:

> are limited partners of Lucky Dragon LP, not of LVEIRC.  LVEIRC is the general partner of Lucky Dragon LP and consists of entities owned and controlled by Mr. Weidner and Mr. Fonfa only.

The correspondence between Jacoby and O'Peak was therefore for the benefit of LP and its partners without taking into consideration any resulting impact on the Debtor.

73.    At times when the Debtor had insufficient funds to operate, was unable to pay debts as they became due, and LP had defaulted on the Loans, Bofu and Eastern received draws in excess of $530,000 from LVEIRC.  Those distributions occurred notwithstanding the Debtor's need for capital, and notwithstanding the undercapitalization of the Debtor.

74.    As the general partner of LP, LVEIRC was responsible for the debts of LP.  As a result, the Defendants' decisions focused on the best interests of LVEIRC and LP, ignoring the interests of the Debtor and its creditors.  Examples of this include the Debtor paying Silver Arch a due diligence fee rather than paying the Debtor's creditors, the Debtor paying Lewis Roca rather than the Debtor's creditors, and allocating Debtor's expenses to LP to protect LP and its partners.

75.    The Trustee is informed and believes that Debtor and LP filed for bankruptcy protection, among other things, to keep the Resort up and running so that LVEIRC, W. Weidner, Fonfa and Jacoby could minimize exposure to claims by the EB-5 investors and/or WARN Act

2254904

claims and to minimize personal liability for violating the terms of the POM.  The Resort was forced to close its doors, which triggered WARN Act issues, which ultimately if not resolved would be the responsibility of the Defendants.

### The Debtor and Defendants Did Not Comply with Corporate Formalities

76.    The Debtor did not maintain adequate corporate books and records.  The Debtor's books and records contain no minutes or records of organizational meetings or evidence that such meetings ever took place.

77.    Requests for capital contributions by the Debtor were often ignored and members of LVEIRIC failed to make the requisite contributions to fund capital calls.  There are no records of organizational meetings or meetings of members addressing the failure of Defendants to heed capital calls and the impact the lack of funds would have on the Debtor and the Resort.  Rather than fund the Debtor and the Resort and honor capital calls made by the Debtor, in early January 2018, the Defendants elected to layoff certain employees and only continue to operate the hotel.

78.    There are also no records of organizational meetings regarding the Loans or any business decisions made by the Debtor.  Financial transactions between the Defendants and Debtor and LP were rarely documented.  For example, alleged loans and/or capital contributions by the Debtor's members were not formally documented.

79.    There are no records of the Debtor that analyze or explain the Defendants ignoring conflicts of interest and the Debtor taking actions for the benefit of Defendants to the detriment of the Debtor.

80.    LVEIRIC, Jacoby, Fonfa and W. Weidner at all times relevant herein, demonstrated a complete lack of interest in maintaining or understanding the books and records of the Debtor.  No records exist as to whether funds allegedly provided to the Resort by Fonfa and W. Weidner were notes or capital contributions.

81.    There are no corporate records disclosing conflicts of interest with respect to transactions wherein Defendants were on both sides of the transactions.  Defendants obtained no opinions from disinterested parties as to the propriety of these non-arms-length transactions, none of which were in the best interests of the Debtor.

2254904

**Defendants Failed to Exercise Reasonable Prudence In Making Business Decisions**

82.     Construction of the Resort commenced in April 2015 and the Resort opened in November 2016.  The original construction budget was $109,000,000.00 (excluding $6,000,000 budgeted for operations).  By the time the Resort was complete, the budget had ballooned to over $160,000,000, an increase of 46.7% from the initial budget.  This was a direct result of the Defendants' wholly inadequate planning.

83.     The approved Business Plan does not provide for debt.  The executing of and obtaining of the Loans was a breach of the fiduciary duty of care and duty of loyalty as it increased the operating expenses of the Resort and saddled it with expenses it could not carry.   This directly injured the Debtor because it made the Resort's operations unsustainable.  The Loans subjected the Debtor to unnecessary risk.

84.     Attempts to obtain additional financing to fund operating expenses were not reasonable and were unsuccessful.  Rather than LVEIRC and the other Defendants making capital contributions, the Defendants made an additional request for funding for the LP from the EB-5 investors and attempted to incur additional debt.  Both of these attempts to obtain funding were unsuccessful.  The Defendants acted contrary to the best interests of the Debtor by having the Debtor pay amounts for the benefit of LP and Defendants.  For instance, the Defendants directed the Debtor to pay: (1) a due diligence deposit of $187,500 on or about October 5, 2017 by wire transfer to Silver Arch for the purpose of locating funding solely for LP; and (2) Lewis Roca invoices that were for services provided to LVEIRC rather than the Debtor.

85.     The value of the Debtor and the Resort suffered a dramatic reduction under the direction of LVREIC, Fonfa, W. Weidner and Jacoby.

86.     After the Petition Date, Defendants' attempts to obtain Debtor in Possession financing were abysmal.  Upon locating post-petition financing, Defendants were unable to demonstrate that such funding was necessary or appropriate.  The Court did not approve the proposed debtor in possession financing.

87.     The Defendants also demonstrated a complete lack of knowledge of the financial situation of the Debtor both pre-petition and post-petition.  Fonfa testified at the second 341(a)

2254904

meeting of creditors held on April 12, 2018, that he had not reviewed the schedules and statement of financial affairs that he previously executed on behalf of the Debtor under penalty of perjury. Fonfa also was not able to confirm that the information contained in the Debtor's schedules and statement of financial affairs was true and correct.

## FIRST CLAIM FOR RELIEF

**Breach of Fiduciary Duty – Against Defendants Las Vegas Economic Impact Regional Center, LLC; David Jacoby; William P. Weidner; Eastern Investments, LLC; Bofu, LLC; Andrew S. Fonfa; Weidner Management, LLC; and James Weidner**

88.     The Plaintiff realleges and incorporates by reference each and every allegation set forth in paragraphs 1 through 87, inclusive, as though fully set forth herein.

89.     At all times relevant to this claim for relief, Defendants were officers of the Debtor and/or direct and indirect members of the Debtor and owed a fiduciary duty to the Debtor that prevented them from taking actions that would harm the Debtor for their own benefit, as well as any additional duties that they may have owed to its creditors.

90.     At all times relevant to this claim for relief, LVEIRC was the sole member manager of the Debtor and the general partner of LP. At all times relevant to this claim for relief, the members and managers of LVEIRC were Bofu and Eastern. At all times relevant to this claim for relief, Fonfa was the managing member of Eastern and James Weidner was the managing member of Bofu.

91.     At all times relevant to this claim for relief, Fonfa served as the signatory for the Debtor and executed Court documents, agreements, and other legal documents on the Debtor's behalf.

92.     By reason of their fiduciary relationship as members, managers and/or officers of the Debtor, Defendants each owed the Debtor and its creditors the highest obligation of good faith, fair dealing, loyalty, and care.

93.     At a minimum, Defendants owed directly to the Debtor the duty to: (a) exercise due care and diligence in the management and administration of the Debtor and in the use and preservation of the Debtor's property, funds, and assets; (b) act with the utmost good faith and

2254904

loyalty, refrain from placing their personal interests ahead of those of the Debtor and, upon insolvency, its creditors, and to avoid any self-dealing; (c) ensure that they did not engage in any unsound management and investment practices; and (d) not engage in transactions that would result in corporate waste.

94. Defendants and each of them, had, as alleged above, fiduciary duties of loyalty and care owed to Debtor by virtue of, among other things, their status as managing members and officers of the Debtor. And as fiduciaries of the Debtor, each of the Defendants therefore had duties of utmost due care, good faith and loyalty to Debtor, and each had a duty to conduct themselves in a manner that placed the interests of Debtor ahead of their own.

95. Each of the Defendants failed to act as reasonably prudent and careful managers or members of the Debtor and/or officers of the Debtor would have acted under the same or similar circumstances and breached each one of their duties of good faith, loyalty and care. Among other things, the Defendants collectively, or as individually identified herein:

a. Failed to properly capitalize and fund the Debtor and the Resort;

b. Failed to act as independent and disinterested fiduciaries acting on behalf of the interests of the Debtor (*e.g.,* LVEIRC making membership distributions rather than using the money to capitalize the Debtor and fund the operations of the Debtor, failing to make sufficient capital contributions, authorizing the Debtor to satisfy obligations of the Defendants over Debtor's creditors); instead, Defendants made decisions and took actions for their own benefit and to the detriment of the Debtor,

c. Engaged in self-dealing by diverting assets from the Debtor to the Defendants or for the benefit of the Defendants;

d. Engaged in self-dealing by putting their interests above those of the Debtor (*e.g.*, instructing the Debtor to pay legal fees of LVEIRC incurred for Defendants' benefit even though the Debtor was unable to pay its debts as they became due at the time, entered into the Purchase Agreement for the benefit of Defendants, and instructing the Debtor to pay an exorbitant due diligence fee for a loan to LP);

e.     Failed to realize that additional funding for the Resort was necessary until it was far too late and sought to obtain funding through more debt, to the detriment of the Debtor;

f.     Failed to conduct adequate due diligence and planning prior to starting the development of the Resort and the operations of the Debtor;

g.     Failed to institute appropriate and necessary internal accounting and management controls, reporting systems and levels of supervision and review in regard to the financial operations of the Debtor and the Resort (*e.g.*,  development and construction overruns, failing to recognize cost overruns until it was too late, unrealistic operating projections);

h.     Operated the Debtor while it was unable to pay debts as they became due and/or was insolvent contrary to the Defendants' fiduciary obligation to conserve assets and value for the benefit of the Debtor and its creditors;

i.     Failed to preserve the value of the Debtor and the Resort in violation of their duty of loyalty and duty to act in good faith;

j.     Defendants placed their personal interests above those of the Debtor and its creditors by disbursing the $8.5 management fee from the EB-5 Investors paid to LVEIRC rather than using it for the business operations of the Debtor and development expenses of the Resort;

k.     Defendants placed their personal interests above those of the Debtor and its creditors by entering into self-serving contracts with the Debtor;

l.     Failing to maintain any corporate formalities including but not limited to holding organizational meetings and maintaining minutes of meetings or any record of the decisions and operations of the Debtor.

*See* ¶¶ 33-81 above.

96.     Defendants owed to the Debtor, and its creditors upon insolvency, a fiduciary duty to act with the utmost good faith and loyalty and to act in the best interests of the Debtor and its creditors as a whole.

2254904

97.     The Defendants' decisions and actions as set forth above are not and were not attributable to a rational corporate purpose.

98.     Defendants used each of their positions of trust as officers and direct or indirect members of the Debtor to further their private interests to the detriment of the Debtor.

99.     The Defendants appeared on both sides of transactions and derived personal financial benefit from their self-dealing.

100.    With respect to those independent actions that did not involve self-dealing, the Defendants failed to exercise reasonable business judgment and took actions without considering actual or potential conflicts of interest.  In this regard, the Defendants failed to inform themselves adequately and consider all material information reasonably available to them, failed to consider actual or potential conflict of interest prior to forming the Debtor, prior to proceeding with operating the Debtor and the Resort, and prior to making decisions and taking actions on behalf of the Debtor. See ¶¶ 61-75, 82-87 above.

101.    Defendants, and each of them, failed to act as reasonably prudent and careful and independent officers and members of a limited liability company would have acted under the same or similar circumstances as set forth in ¶¶ 76-87 above.

102.    Debtor was unable to pay debts as they became due and was insolvent prior to the Petition Date because its liabilities exceeded its assets.

103.    The Defendants were under an obligation to avoid diversion or dissipation of Debtor's assets and to avoid acts that would subject Debtor's assets to undue risk, and to exercise their judgment in an informed, good faith effort to maximize the Debtor's long term wealth-creating ability.  Defendants failed to act to avoid diversion or dissipation of Debtor's assets and to avoid acts that would subject Debtor's assets to undue risk and failed to exercise their judgment in an informed good faith effort to maximize the Debtor's long-term wealth creating ability.

104.    As a direct and proximate result of the failure of Defendants to act as reasonably prudent and careful managers and/or officers would have acted under the same or similar circumstances, the Debtor has been damaged in a sum according to proof at trial but in excess of $14 million.

2254904

105.    In doing the acts herein alleged, Defendants caused injury to the Debtor by their acts and conduct as complained of above and in so doing acted willfully, wantonly and maliciously toward the Debtor and its creditors.  Accordingly, Plaintiff is entitled to an award of exemplary and punitive damages in an amount to be proven at the time of trial of this matter.

**SECOND CLAIM FOR RELIEF**

**Gross Negligence  – Against Defendants Las Vegas Economic Impact Regional Center, LLC; David Jacoby; William P. Weidner; Eastern Investments, LLC; Bofu, LLC; Andrew S.  Fonfa; Weidner Management, LLC; and James Weidner**

106.    The Plaintiff realleges and incorporates by reference each and every allegation set forth in paragraphs 1 through 105, inclusive, as though fully set forth herein.

107.    Defendants owed a duty of care to the Debtor as they were managers and officers of the Debtor.

108.    As described herein the Defendants breached that duty of care to the Debtor, failing to exercise even the slightest degree of care, by *inter alia,* the following actions:

    a.    Failing to adequately capitalize the Resort;

    b.    Relying on inaccurate and inflated projections;

    c.    Authorizing excessive cost overruns;

    d.    Shutting down the casino and laying-off employees knowing that such lay-offs would result in the loss of the Debtor's gaming license if they were not hired back within six (6) months;

    e.    Entering into agreements that were detrimental to the Debtor but beneficial to the Defendants;

    f.    Disbursing the management fee received by EB-5 investors rather than using it to fund Debtor's operations or prevent a default on the Loans;

    g.    Taking draws at a time when LP had defaulted on the Loans;

    h.    Making business decisions for the benefit of LP and Defendants at the expense of the Debtor and its creditors.

*See* ¶¶ 33-87.

2254904

109.     Defendants engaged in acts and omissions as described herein respecting legal duty of an aggravated character, or with willful, wanton misconduct.

110.     Theses breaches of care by the Defendants were the legal cause of Debtor's injuries.

111.     The Debtor suffered damages because of Defendants actions in an amount to be proven at trial but in excess of $14 million, including but not limited to lost profits and the incurring of debt to its creditors.

## **PRAYER FOR RELIEF**

**WHEREFORE**, the Trustee prays for judgment on this Complaint as follows:

1.     On the First Claim for Relief, for a judgment determining that Defendants, and each of them, breached their fiduciary duties of loyalty and fiduciary duties of care to the Debtor, and awarding actual damages in an amount according to proof at trial, but in excess of $14 million; and, for an award of exemplary and punitive damages in an amount according to proof at trial;

2.     On the Second Claim for relief, for a judgment determining that Defendants and each of them demonstrated gross negligence, and awarding actual damages in an amount according to proof at trial, but in excess of $14 million;

3.     For punitive damages according to proof, as recoverable by law;

4.     For costs of suit as recoverable by law; and,

5.     For such other and further relief as the Court deems just and proper.


Dated:  February 13, 2020                    BRUTZKUS GUBNER


                                            By:   /s/ Steven T. Gubner
                                                  _____
                                                  Steven T. Gubner
                                                  Robyn B. Sokol
                                                  Corey R.  Weber
                                                  Special Litigation Counsel for
                                                  Brian D. Shapiro, Chapter 7 Trustee

2254904